UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.

| | |
|---|---|
| KWESI ABLORDEPPEY | ) |
| *and others similarly situated*, | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| BENNETT WALSH, DAVID CLINTON, | ) |
| VANESSA LAUZIERE, VANESSA GOSSELIN, | ) |
| and CELESTE SURREIRA, | ) |
| Defendants. | ) |

CLASS ACTION COMPLAINT

INTRODUCTION[1]

1.      This is a class action alleging Civil Rights violations brought pursuant to the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983.

2.      Kwesi Ablordeppey ("the class representative") is an employee of the Holyoke Soldiers' Home ("Soldiers' Home").

3.      The Soldiers' Home is a state-funded health care facility that offers residential accommodations, hospice care, and outpatient services to veterans who served our country.

4.      The employees of the Soldiers' Home are dedicated to fostering a warm and loving "home" for our veterans; comforting and consoling them in their most difficult private moments and developing close relationships with them and their families.

5.      In March 2020, certain Soldiers' Home managers and supervisors, specifically, Superintendent Bennett Walsh ("Superintendent Walsh"); former Medical Director Dr. David Clinton ("Dr. Clinton), former Chief Nursing Officer Vanessa Lauziere ("Chief Nurse Lauziere"), former Infectious Disease Nurse Vanessa Gosselin ("Nurse Gosslein"), and former Assistant Director of Nursing Celeste Surreira ("Nurse Surreira") (collectively, "the Soldiers' Home Defendants) made a series of criminally catastrophic decisions that led to the slow, agonizing, and preventable deaths of seventy-seven (77) veterans.

---

[1] For any avoidance of doubt, these allegations are included as part of the Plaintiffs' and the Class Complaint, whether or not repeated in full or in part below.

6.      At first, these decisions appear to have been made based on the ill-considered belief that if the Soldier's Home Defendants simply ignored the coronavirus, then it would not affect the people who lived and worked in the facility.

7.      When it became clear that these decisions were leading to disastrous results, the Soldiers' Home Defendants failed to ask for help, and instead took affirmative steps to conceal the death and devastation they had wrought from the veterans and their families, from employees and their unions, and from the Commonwealth itself.

8.      Those affirmative actions led to even more disastrous and horrific consequences.

9.      These decisions appear to have been based on a complete disregard for human life.

10.     This case addresses the effect of those decisions on the employees and what they were forced to endure as a result.

11.     The Soldiers' Home Defendants deceived their employees about the risks of coronavirus; they forced employees to continue working even as they exhibited symptoms of COVID, as they waited for the results of COVID tests, and even after they had tested positive. They required employees to work long hours, providing nursing care to infected veterans while denying them access to personal protective equipment ("PPE") and the necessary medication to provide care to the dying veterans.

12.     The Defendants' deplorable actions caused the employees to work in inhumane conditions. The employees watched in horror as the veterans they cared for suffered horrible deaths.

13.     The actions of the defendants resulted in more than eighty (80) employees becoming sickened with Covid-19, many requiring hospitalization. Some continue to experience so-called "long haul" symptoms to this day.

14.     What the employees witnessed at the Soldiers' Home left them emotionally traumatized, and they continue to suffer from post-traumatic stress disorder ("PTSD"), anxiety, depression, and other serious mental health issues to this day.

15.     This case seeks to redress the needless pain and suffering that these employees endured as a result of the actions and inactions of the Soldiers' Home Defendants.

## PARTIES

16.     The Soldiers' Home is located in Holyoke, Massachusetts.

17.     The Plaintiff and class representative, Kwesi Ablordeppey, lives in Springfield, Massachusetts.

18.     Pursuant to Federal Rule of Civil Procedure 23, the Plaintiff seeks to certify a class of similarly situated individuals and/or estates of individuals who, like the Plaintiff, were employed at the Soldiers' Home during the

19.     COVID-19 outbreak between February 1, 2020 and April 1, 2020 and suffered harm as a result.

20.     Certification of a class pursuant to Rule 23(a) is appropriate because:

a.      The class is so numerous that joinder of all members is impracticable. At least (83) employees contracted COVID-19 as a result of decisions made during that time period, and all employees suffered emotional injuries due to the catastrophic decisions the Defendants made between February 1, 2020 through April 1, 2020, which resulted in the COVID-19 outbreak.

b.      There are common questions of law or fact, including, whether, during the critical time period of February 1, 2020 through April 1, 2020:

(1)     the Soldiers' Home Defendants acted or failed to act in a manner that deprived Soldiers' Home employees of their civil rights, including their right to safety, freedom from harm, and the full enjoyment of their lives;

(2)     the Soldiers' Home Defendants substantially departed from acceptable professional standards in providing a safe work environment to the employees of the Soldiers' Home;

(3)     the Soldier Home Defendants' actions and inactions constituted deliberate indifference to the health and safety of the employees of the Soldiers' Home; and

(4)     the Soldiers' Home Defendants acted in a manner that caused harm to the employees of the Soldiers' Home

(5)     whether the Defendants engaged in affirmative conduct that created danger or increased the Plaintiffs' vulnerability to the danger in some way; that the Defendants' conduct put the Plaintiffs at substantial risk of serious immediate harm; that the risk was obvious or known; that the Defendants acted recklessly in conscious disregard of the risk; and that such conduct, when viewed in total, was conscience shocking.

c.      The claims of the named Plaintiff are typical of the claims or defenses of the class, since all suffered from a common cause, the result of the common actions of the Soldiers' Home Defendants.

d.      The named Plaintiff will fairly and adequately protect the interests of the class, and there are no antagonistic interests with other members of the class.

e.      Certification of a class pursuant to Rule 23(b)(3) is appropriate because "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

21.     The Defendant, Superintendent Walsh, is the former Superintendent of the Soldiers' Home in Holyoke, Massachusetts. He currently resides in Massachusetts.

22.     The Defendant, Dr. Clinton, is the former Medical Director of the Soldiers' Home in Holyoke, Massachusetts. He currently resides in Massachusetts.

23.     The Defendant, Chief Nurse Lauziere, is the former Chief Nursing Officer of the Soldiers' Home in Holyoke, Massachusetts. She currently resides in Massachusetts.

24.     The Defendant, Nurse Gosselin, is the former Infectious Disease Nurse of the Soldiers' Home in Holyoke, Massachusetts. She currently resides in Massachusetts.

25.     The Defendant, Nurse Surreira, is the former Assistant Director of Nursing of the Soldiers' Home in Holyoke, Massachusetts. She currently resides in Massachusetts.

## JURISDICTION AND VENUE

26.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because the claims arise under the laws of the United States, *i.e.,* the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

27.     This Court has supplemental jurisdiction over any state law claims the Plaintiffs might bring pursuant to 28 U.S.C. § 1367(a).

28.     This Court has personal jurisdiction over the Defendants because they each reside in Massachusetts and, during the relevant time period, they each worked in Massachusetts where the incidents underlying the Complaint occurred.

29.     Venue is proper in the Western Division of this Court because all parties reside in either Hampshire County or Hampden County.

## FACTUAL BACKGROUND

I.      *Problems at the Soldiers' Home in the Years Leading up to the Pandemic.*

30.     The Holyoke Soldiers' Home is one of two state veterans' homes in Massachusetts. It serves as a long-term care facility, and offers 248 beds to individuals who previously served in our country.

31.     Pursuant to statute, the Soldiers' Home is managed by a seven-member voluntary Board of Trustees appointed by the governor. The Board appoints a Superintendent who serves as the administrative head of the home.

32.     The Department of Veterans' Services is an agency within the Executive Office of Health and Human Services ("EOHHS"), and has supervisory and administrative responsibility for the Soldiers' Home. At all pertinent times to this Complaint, Secretary Francisco Urena ("Secretary Urena") served as Secretary of the Department of Veterans' Affairs.

33.     On May 29, 2016, the Board appointed Bennett Walsh to be Superintendent of the Soldiers' Home. Walsh served as superintendent until March 30, 2020 when he was removed as a result of the events that give rise to this Complaint.

34.     Massachusetts statutes authorize the Soldiers' Home superintendent (with approval of the Trustees) to appoint, *inter alia*, a medical director, and other people that the superintendent deems necessary to operate the Soldiers' Home efficiently.

35.     Superintendent Walsh appointed Dr. Clinton to serve as Medical Director of the Soldiers' Home during the relevant events set forth in this Complaint. Superintendent Walsh also appointed Chief Nurse Lauziere, Nurse Gosselin, and Nurse Surreira to the leadership team.

36.     Superintendent Walsh was not a licensed nursing home administrator and did not possess any experience in managing a healthcare facility.

37.     Secretary Urena felt Walsh was not qualified for the position. He also did not trust Walsh, whom he considered to be deceptive.

38.     Walsh was frequently absent from his job at the Soldiers' Home; when he did come in, he was frequently overly aggressive with employees.

39.     Ultimately Secretary Urena reprimanded Walsh for the way Walsh treated his workers, and he was forced to take "anger management classes" due to his offensive managerial style.

40.     In June 2019, the Deputy Superintendent, the only manager at the Soldiers' Home with a license in nursing home administration, and the only manager with actual experience working as a nursing home administrator, resigned.

41.     The Deputy Superintendent position remained vacant until March 30, 2020, after the events that give rise to the complaint.

42.     The vacancy in that position left a gaping vacuum of experience in the Soldiers' Home, a fact of which Superintendent Walsh was well-aware.

43.     There were chronic staff shortages at the Soldiers' Home in the years leading up to March 2020.

44.     This was, in part, due to Superintendent Walsh's management style; it was also due to the fact that the Soldiers' Home Defendants never scheduled staff to work the

same days and hours from week to week, and often forced staff to work overtime without prior notice, a practice known as "mandation."

45.  In August 2019, the Executive Office of Health and Human Services directed Superintendent Walsh to implement a permanent staffing schedule to reduce uncertainty among staff, reduce overtime (including mandating overtime) and stabilize the facility.

46.  Superintendent Walsh ignored this directive.

## II.  *The Pandemic arrives in Massachusetts*

47.  COVID-19 is an infectious respiratory disease caused by a novel coronavirus known as COVID-19 (hereinafter "COVID-19" or "the virus").

48.   COVID-19 is highly contagious.

49.   COVID-19 often results in serious, long-term health complications and has caused more than 600,000 deaths in the United States to date.

50.  The virus primarily spreads from person to person through respiratory droplets produced when an infected person coughs or sneezes.

51.  Spread is more likely when people are in close contact with one another (i.e., within 6 feet).

52.  The virus can be spread by people who are asymptomatic, pre-symptomatic, or mildly symptomatic.

53.  Health care workers who work in hospital settings are at particular risk for exposure to COVID-19, as they often work in close quarters for long periods of time with patients. Health care workers can be exposed to the droplets through, *inter alia,* the air, patient contact and/or handling patient bodily fluids.

54.  The United States reported its first COVID-19 case on January 21, 2020.

55.  On January 31, 2020, the United States Department of Health and Human Services declared a national public health emergency.

56.  On February 1, 2020, Massachusetts state health officials confirmed the first case of coronavirus.

## III.  *The Soldiers' Home Defendants ignore all infection control precautions making the Soldiers' Home vulnerable to the rapid spread of infection.*

A. *The Soldiers' Home Defendants begin making decisions that are the opposite of infection control.*

57. An independent investigation commissioned by the Governor of the Commonwealth, captioned *"The Covid-19 Outbreak at the Soldiers' Home in Holyoke: An Independent Investigation Conducted for the Governor of Massachusetts"* ("Report") documented the conscience-shocking and deliberately indifferent behavior of the Soldiers' Home Defendants tasked with managing and overseeing the Soldiers' Home. The Report is incorporated by reference in this Complaint and attached as *Exhibit 1.*

58. Beginning in February 2020, the Commonwealth and the United States government began promulgating guidance directed at protecting people from COVID-19; this guidance expressly directed institutions to (a) identify patients with COVID-19, and (b) isolate patients with COVID-19 from other patients and staff.

59. The Soldiers' Home Defendants ignored this guidance.

60. By February 26, 2020, the national news media was reporting the first COVID-19 outbreak at a nursing home facility in Kirkland, Washington. Two residents who had tested positive for COVID-19 died, and the facility was put on lock-down. Over the next several weeks, 35 people at the facility died from COVID-19.

61. The Soldiers' Home Defendants were well-aware of the Kirkland nursing home tragedy.

62. However, Defendants took virtually no steps to reduce the risks of COVID-19 infections.

63. In mid-February 2020, the first resident, known as "Veteran One" began exhibiting clear symptoms of COVID-19, virus including a "high-pitched cough and fever." (Report at p. 78).

64. Throughout February and March 2020, multiple Soldiers' Home employees expressed concern to Chief Nurse Lauziere and Nurses Gosselin and Surreira that Veteran One was not responding to medication; that his condition was not improving; that he might be infected by COVID-19; and that he should be tested for COVID-19 immediately.

65. Superintendent Walsh and Dr. Clinton were also informed of Veteran One's condition.

66.     Nonetheless, the Soldiers' Home Defendants ignored these concerns.

67.     They did not arrange for testing Veteran One for COVID-19.

68.     Nurse Gosselin, an infection control nurse, told employees she did not want to test Veteran One because there was "too much paperwork involved."

69.     They forbade employees from isolating Veteran One, and ordered Veteran One to be treated in an open room.

70.     On February 27, 2020, as federal and state officials were bracing for the possibility of a pandemic, one EOHHS staffer wrote to Superintendent Walsh about the need to immediately implement the staffing changes that had been previously ordered in August 2019 (*see* ¶ 44) in case there was a staffing shortage due to the novel coronavirus.

71.     Superintendent Walsh ignored this directive.

72.     On March 10, 2020, the Board of Trustees of the Soldiers' Home held a regularly scheduled meeting at the Soldiers' Home.

73.     During the meeting, Board members asked how the Soldiers' Home was preparing for a COVID-19 outbreak, including inquiring as to what would happen if there were staff shortages.

74.     In response, Superintendent Walsh noted that there were four outside staffing agencies with which the Soldiers' Home had previously contracted, and that the Soldiers' Home could and would call upon those agencies in the event of a staff shortage.

75.     During the dire staffing shortage in the ensuing weeks, the Soldiers' Home Defendants never once utilized any of these four staffing agencies.

76.     In the hours following the March 10 Board meeting, Superintendent Walsh, Dr. Clinton, and Nurses Lauziere and Gosselin met to consider the creation of isolation rooms for COVID-infected residents.

77.     During this meeting, Nurse Gosselin asked Nurse Lauziere whether the Soldiers' Home would follow the Center for Disease Control's guidance and designate certain staff members to care for patients in isolation rooms in order to avoid floating staff from contaminated to non-contaminated areas.

78.     Nurse Lauziere rejected the idea.

79.     On March 10, 2020, Governor Baker declared a state of emergency in Massachusetts because of the pandemic.

80.     Three days later, on March 13, 2020, the Center for Medicare and Medicaid Services issued recommendations to long-term care facilities, such as the Soldiers' Home, to close communal dining rooms and immediately cease all group activities.

81.     The Soldiers' Home ignored the communal dining recommendations for days. During that time, employees and veterans continued to use communal dining space at the Soldiers' Home.

82.     The Soldiers' Home Defendants ignored the group activity recommendations for weeks. During that time, veterans continued to gather in the indoor smoking rooms.

83.     On March 15, 2020, Governor Baker banned gatherings of more than 25 people.

84.     That same day, a Soldiers' Home nursing assistant with twenty-five years' experience reported to Defendant Surreira that Veteran One "was weak, feverish, and coughing more than he had been previously" and that he might have COVID-19. (Report at p. 78).

85.     By this time, Veteran One had been exhibiting COVID-like symptoms for one month.

86.     Nevertheless, Nurse Surreira dismissed the suggestion that Veteran One might have COVID, did not alert employees that they might be at risk for exposure, did not disclose the deterioration in Veteran One's condition to any other manager, and withheld PPE from employees that was otherwise readily available. (Report at p. 78).

87.     Beginning on March 16, during the overnight shift, a second nursing aide who was treating Veteran One, informed Nurse Surreira that she believed Veteran One might have COVID-19.

88.     Nurse Surreira again challenged this assessment, however, she ultimately disclosed Veteran One's symptoms to Veteran One's treating physician.

89.     The doctor ordered Veteran One to be tested for COVID-19.

90.     On March 17, Veteran One was the first veteran at the Soldiers' Home to be tested for COVID-19. The testing swab was sent to a laboratory in California that had a four-to-five-day turnaround time.

91.     Shortly thereafter, Nurse Lauziere, who had learned that Veteran One had been tested, asked Dr. Clinton whether Veteran One should be moved to an isolation unit.

92.     According to the Report, "Dr. Clinton replied that this was a 'moot point' because 'everyone has been exposed already' on Veteran One's unit, and it would put the rest of the residents of the Home at risk if Veteran One were moved elsewhere." (Report at p. 79).

93.     Dr. Clinton's medical advice was contradicted by all federal and state COVID-19 guidance and fell far below the standard of care.

94.     After Veteran One was tested, the Soldiers' Home Defendants placed no restriction on his movement whatsoever; in fact, he continued to sleep in a shared room with three other veterans, continued to recreate with the other veterans, and continued to be treated by employees who were not provided with PPE.

95.     On March 21, 2020 around 9:15 p.m. Nurse Lauziere called Dr. Clinton to inform him that Veteran One had tested positive for COVID-19.

96.     They again discussed whether Veteran One should be moved to an isolation unit.

97.     According to the Report, "Dr. Clinton advised against doing so, as in his view others in [Veteran One's unit of] 1-North had been exposed already, and the facility would be at risk if Veteran One got out of his room on an unsecured unit." (Report at p. 81).

98.     During this time, the Department of Veterans' Affairs repeatedly asked the Soldiers' Home Defendants if Veteran One was being kept in isolation, and the Defendants falsely represented that he was.

99.     On March 21, 2020, Dr. Clinton started to develop respiratory symptoms. He reported to the emergency room on March 22, 2020.  While the test was pending, his physician instructed him to remain at home. Dr. Clinton eventually tested negative for COVID-19.

100.    Dr. Clinton did not return to work at the Soldiers' Home until March 27, 2020.

101.    During his absence, no one assumed the duties of Medical Director, and while veterans and employees became sickened at an alarming rate, Dr. Clinton continued to "consult" with the other Soldiers' Home Defendants from the comfort of his own home.

B. *Meanwhile, the Soldiers' Home Defendants took Affirmative Steps to Make the Facility Unsafe for the Employees; they hid PPE from their employees and punished employees who wore their own PPE.*

102.     There was sufficient PPE at the Soldiers' Home to protect the employees throughout the month of March.

103.     Nonetheless, on March 4, 2020, Nurse Gosselin sent an email to all Soldiers' Home employees indicating  that there was not enough PPE. Nurse Gosselin falsely reported a shortage of masks and instructed the employees to only use gloves on an "as needed" basis.

104.     On March 5, 2020, Nurse Gosselin notified supervisory staff that she had removed masks, gowns and gloves from the floors and public areas in order to "conserve resources" and directed supervisors to "ration" masks.

105.     Meanwhile, Nurse Gosselin represented to employees that if they desired a mask, all they needed to do was ask their unit managers or a supervisor for permission.

106.     The Soldiers' Home Defendants routinely denied PPE to employees who requested it without explanation.

107.     Throughout March, staff with access to the offices where PPE was being concealed observed stacks of boxes of new masks.

108.     On March 6, 2020, the Department of Veterans' Affairs issued guidance to Superintendent Walsh to limit staff movements, assess the veterans daily for symptoms, develop an isolation plan for suspected cases, and encourage social distancing.

109.     The Soldiers' Home Defendants ignored this guidance.

110.     Instead, throughout March, the Soldiers' Home Defendants ordered staff to "float" between caring for Veteran One and caring for other veterans in the facility and deprived these staff members of access to PPE.

111.     On March 13, 2020, Superintendent Walsh received an email from the Department of Veterans Affairs informing him as to how to obtain access to hand sanitizer and N95 masks.

112.     Superintendent Walsh declined to request additional PPE, and continued to direct the other Defendants to conceal the PPE the Soldiers' Home possessed.

113.    Throughout March, employees repeatedly raised concerns with Nurse Gosselin that she had removed surgical masks from the floors and that they needed PPE due to the high risk of COVID-19.

114.    In an attempt to lull employees into a false sense of safety, Nurse Gosselin, an infection control nurse, made false representations to employees about the contagiousness of COVID-19.

115.    For example, she stated that COVID-19 was "not airborne" that it was "nothing to be concerned about" that the flu was "far worse" and that there was "no need" to wear PPE to treat veterans experiencing COVID-related symptoms and that "masks were only for people who hadn't received a flu shot."

116.    This information flew in the face of the health information being disseminated by the international, national, and state health communities, the news media, and the Governor of Massachusetts.

117.    Since the Soldiers' Home was not providing PPE to its employees, some employees resorted to finding their own PPE to wear at work.

118.    The Soldiers' Home Defendants began reprimanding employees who wore any PPE, whether they brought it from home or not.

119.    For example, on March 16, a nursing assistant who treated Veteran One, brought her own mask to work.

120.    Defendant Surreira reprimanded the nursing assistant for wearing a mask.

121.    On another occasion, Certified Nursing Assistant Carmen Rivera wore her own mask from home. Nurse Gosselin reprimanded her and told her that she was "not supposed to be wearing a mask."

122.    CNA Rivera tested positive for COVID-19 days later, and thereafter developed pneumonia.

123.    On March 17, Superintendent Walsh sent a threatening email to staff that the executive team was keeping a "watchful eye" on the supplies of PPE. (Report at p. 71).

124.    On or about March 17, Nurse Lauziere and Infection Control Nurse Gosselin informed staff that the Soldiers' Home would not be distributing any more PPE because they were "running out."

125.    This was not true; the Soldiers' Home was not running out of PPE and in fact had a surplus of PPE.

126.    Shockingly, even though the Soldiers' Home Defendants claimed they did not possess enough PPE, on March 19, 2020, Mr. Walsh directed that a box of 60 N95 masks be sent to the Soldiers' Home in Chelsea. (Report at page 71).

127.    Employees were consistently reminded during this time to be "mindful" of their use of masks and gowns.

128.    On March 17, when the class representative CNA Ablordeppey reported to work, the charge nurse informed him that two veterans were vomiting and incontinent, which are COVID-19-related symptoms.

129.    CNA Ablordeppey wore PPE to care for these patients.

130.    During her rounds, Nurse Gosselin reprimanded Mr. Ablordeppey for his failure to maintain appropriate social distance from the patients for whom he was cleaning their vomit and diarrhea.

131.    Health care workers who provide such care for patients cannot maintain social distance from their patients, which is why it is critical to provide them with PPE.

132.    On March 20, 2020, Nurse Lauziere issued CNA Ablordeppey a formal written reprimand for caring for incontinent patients while wearing PPE. She wrote:

> On this March 18, 2020, during your overnight shift in reaction to safety procedures of which you disagreed, you put on a Personal Protection Equipment without permission or need. Your actions are disruptive, extremely inappropriate and have caused unnecessary resources to be deployed that may be needed in the future. Your behavior unnecessarily disrupted and alarmed staff.  We expect more from you as a seasoned employee of the Soldiers' Home and perceived leader. Please contact me Monday morning 3/23/20.

133.    Nurse Lauziere failed to show up on Monday, March 23 for a meeting with CNA Ablordeppey.

134.    Throughout March, Secretary Walsh repeatedly represented to the employees' unions and to the Department of Veterans Affairs that the Soldiers' Home possessed ample PPE to protect employees.

135.     On March 25, 2020, Superintendent Walsh assured Secretary Urena that the Soldiers' Home was "heavy" on PPE.

136.     Nonetheless, the Soldiers' Home Defendants continued to withhold PPE from staff.

137.     Even at the end of March, when the Home was averaging five deaths a day, the Soldiers' Home Defendants were still discouraging employees from wearing PPE.

138.     Superintendent Walsh, himself, questioned the efficacy of PPE, and told at least one employee, "Don't listen to rumors," about PPE, and that PPE couldn't protect them from COVID.

139.     When Nurse Gosselin observed employees wearing N95 masks she told them that they were being "ridiculous", often rolled her eyes or shook her head at them.

140.     Upon information and belief, the Soldiers' Home Defendants directed supervisors to order employees not to wear PPE.

141.     Upon information and belief, the Soldiers' Home Defendants also directed companies with whom they contracted to provide care to veterans at the Soldiers' Home, to order their employees and independent contractors not to wear PPE.

142.     For example, on or around March 16, 2020, physical therapy assistants, employed by Genesis Healthcare and subcontracted to provide physical therapy to veterans at the Soldiers' Home, were wearing face masks while providing care to veterans.

143.     The Director of Rehabilitation told them to take off the masks because the Soldiers' Home was trying to "save the equipment", because "[masks] don't seal well anyway", and because the Soldiers' Home did not want these workers to "scare people," which would apparently occur if they took measures to protect themselves against the coronavirus.

   C.  *As Soldiers' Home employees contract COVID-19, the Soldiers' Home Defendants continue to order them to work.*

144.     On March 11, 2020, the first Soldiers' Home employee tested positive for COVID-19, and immediately disclosed her positive results to the Soldiers' Home.

145.     On March 12, 2020, the Chief of Staff to Secretary Urena, Paul Moran ("Chief of Staff Moran") sent an email to Superintendent Walsh directing facilities to order employees to stay home if they were "displaying illness symptoms." (Report p. 71).

146.     The Soldiers' Home Defendants ignored this guidance.

147.    Around mid-March, more and more employees, deprived of access to PPE, became sickened with COVID-19.

148.    The Soldiers' Home Defendants realized there was not enough staff to care for isolated patients.

149.    The Soldiers' Home Defendants were aware that there were staffing agencies available to assist in the case of inadequate staffing at the facility, but they took no steps to utilize those services.

150.    Instead, when employees reported experiencing COVID-19-related symptoms, the Soldiers' Home Defendants ordered them to continue working, and sometimes even mandated that they work over-time.

151.    For example, in late February 2020, Nurse Colleen Bartlett became so ill with flu-like symptoms, she barely made it through her shift.[2]

152.    Nurse Bartlett disclosed her symptoms to her supervisor. Nonetheless, her supervisor tried to mandate her. Nurse Bartlett refused and went home after her shift.

153.    As a result, Superintendent Bennett issued her a formal warning that she would be suspended for one day in the future because she refused mandatory overtime.

154.    The Defendants ordered employees who were awaiting COVID-19 test results to continue to work until they actually received a positive test result.

155.    The Defendants also ordered staff members who had tested positive to return to work after quarantining for just three days.

156.    For example, on March 22, CNA Carmen Rivera tested positive for COVID. When she called work to report her positive COVID test, Infectious Disease Nurse Defendant Surreira stated, "Yeah, I hear that people after three days get better and they can come back to work."

157.    In mid-March, Supervisor Walsh made an announcement over the loudspeaker thanking the staff who "showed up to work every day" and threatening those that called in sick. He stated, "We do want to let you know that the staff that have been calling in will be penalized and there will be disciplinary action."

---

[2] Nurse Bartlett was not tested for COVID-19 because, at the time, in February 2020, COVID-19 tests were not widely available.

158.      Mr. Walsh also made an announcement listing the names of staff members who were being written-up for calling in sick.

159.      The purpose of these announcements was to intimidate staff into believing there would be negative employment consequences for them if they called in sick to work.

160.      Around this time, Certified Nursing Assistant, Sophia Darkowaa started experiencing COVID-like symptoms. Ms. Darkowaa disclosed to Chief Nurse Lauziere that she believed she might have COVID-19. She informed one or more of the Soldiers' Home Defendants that she was experiencing headaches and a loss of her sense of smell.

161.      CNA Darkowaa suffered from underlying conditions that greatly increased her risk of serious illness if she contracted COVID-19. She disclosed these underlying conditions to Defendant Lauziere, and requested an accommodation of an N95 mask.

162.      Chief Nurse Lauziere informed CNA Darkowaa that she did not have COVID-19, that she did not need to wear a mask, and that she must report to work.

163.      In mid-March, Certified Nursing Assistant Debra Ragoonana disclosed to Nurse Surreria that she had an underlying condition of asthma that made her more at risk to contract a serious case of COVID-19.

164.      That same day, Nurse Surreira assigned CNA Ragoonana to Veteran One's unit, and did not offer CNA Ragoonana PPE.

165.      Over the next few days, CNA Ragoonana began to experience migraines for the first time in her life. Headaches are a symptom of COVID-19.

166.      Ms. Ragoonana disclosed her symptoms to Nurse Surreira.

167.      In response, Nurse Surreira assured CNA Ragoonana that she "shouldn't worry" and that "all she had to do" to combat COVID-19 was to "just wash your hands and take showers" and if she followed that guidance, she "should be fine."

168.      CNA Ragoonana subsequently tested positive for COVID-19 and was hospitalized for her symptoms.

169.      On or around March 23, 2020, a veteran coughed on a Soldiers' Home licensed practical nurse ("LPN") who had been working without a mask. The  LPN subsequently tested positive for COVID.

170.     On March 23, Infectious Disease Nurse Defendant Gosselin telephoned the LPN and told her that, even though she had tested positive, she should still report to work because she was not symptomatic.

171.     As a result, the LPN returned to work in late March; however, she took COVID tests in April and May 2020, and she continued to test positive through May.

172.     During the last week of March, communication between the Soldiers' Home Defendants and employees deteriorated further. The employees were not told who had been tested, who was symptomatic, and who had been in contact with a person who had tested positive. There was no coordinated education or hands-on training.

   D.     *The Soldiers' Home Defendants conceal the dire situation rapidly unfolding at the Soldiers' Home.*

173.     Throughout March, the Department of Veterans' Affairs repeatedly questioned the Soldiers' Home Defendants if they had adequate staffing to care for isolated patients and they falsely represented that they did.

174.     This was not true.

175.     Throughout March, Service Employees International Union ("SEIU") and the Massachusetts Nurses Association ("Nurse's Union") (collectively, "the unions") voiced concerns about the way the Soldiers' Home was handling the pandemic.

176.     Both unions repeatedly sought information from the Soldiers' Home Defendants about what health and safety protocols were being implemented at the Soldiers' Home, and repeatedly requested an emergency video conference or phone call to discuss. The Defendants ignored these requests.

177.     The unions then contacted the Department of Veterans' Affairs to demand a meeting with the Soldiers' Home Defendants. A meeting was set for March 24.

178.     On the morning of March 24, 2020, Veteran One died from COVID.

179.     Hours later, the unions held a phone conference with Superintendent Walsh, Dr. Clinton, Nurses Lauziere and Gosselin), and individuals from EOHHS to discuss the Soldiers' Home response to the COVID-19 pandemic.

180.     The union leaders raised concerns about the utter lack of health and safety protocols being followed at the Soldiers' Home, and that the employees and veterans were at grave risk for contracting the disease.

181.    During the meeting, the Soldiers' Home Defendants concealed the death of Veteran One, and also concealed the dire situation that was unfolding at the Soldiers' Home.

182.    The Soldiers' Home Defendants refused to discuss the veterans' or employees' positive tests, or address whether anyone had reported COVID-19-related symptoms citing "HIPAA restrictions." (Report at p. 84).

183.    Superintendent Walsh falsely claimed that the Soldiers' Home was "not understaffed." (Report at p. 84)

184.    In reality, at the time of this meeting, the Soldiers' Home was alarmingly understaffed, as very sick employees were calling in every day with positive COVID tests.

        E. *The Soldiers' Home Defendants combine the two dementia wards.*

185.    Early in the third week of March, body bags and a tractor trailer refrigeration unit arrived at the Soldiers' Home.

186.    The Soldiers' Home Defendants ordered social workers to contact family members to discuss end-of-life preferences.

187.    On March 25, 2020, around 3:00 p.m. Superintendent Walsh, Dr. Clinton and Nurses Lauziere and Surreira, participated in a conference call with two DPH epidemiologists to discuss staffing issues and COVID-19 protocols.

188.    During this call, the Soldiers' Home representatives concealed from the Department the fact that they did not have adequate staffing to staff the isolation areas. (Report at page 98).

189.    The Defendants did not discuss their plan to combine the 1-North and 2-North housing units. (Report at p. 99).

190.    During the call, the Soldiers' Home Defendants represented that they were following Department of Public Health (DPH) recommendations.

191.    This was not true.

192.	Superintendent Walsh received word that DPH believed that the Soldiers' Home was "doing everything they can and consistent with DPH recommendations." (Report at Page 99).

193.	At 4:34 p.m.: Mr. Walsh forwarded this email to Ms. Lauziere and Ms. Surreira stating only: "boom."

194.	Superintendent Walsh wrote "boom" because he believed DPH had accepted the misrepresentations they had made.

195.	On March 27, 2020, at 9:45 a.m., Walsh reported to the Department that there were "28 [people] tested, 7 positives, 3 negative, and 18 pending."  (Report at p. 99).

196.	On Friday, March 27, 2020, 13 body bags arrived at 1-North at around 2:45 p.m., shortly before the consolidation of the two units began.

197.	At 3:00 p.m. Mr. Walsh participated in a conference call with Secretary Urena among others from the Department of Veterans Services. He did not disclose that he intended to combine the two dementia units because of staff shortages. (Report at p. 99).

198.	After the phone call, the Soldiers' Home Defendants conspired together to combine two locked dementia units, doubling the number of veterans to 42 people.

199.	Superintendent Walsh, Dr. Clinton, Ms. Lauziere, and Ms. Surreira were each involved in the decision to combine the two units and put all the veterans in one unit, including utilizing the dining room for space.

200.	According to the Report, combining the units "… required that veterans be crowded into rooms and common spaces, with their beds inches apart. (Report at p. 87).

201.	To accomplish this, housekeeping was instructed to prepare the dining room for the veterans and were ordered to remove the dining tables and chairs.

202.	At the time that this decision was made, both 1-North and 2-North "contained a mix of patients: some were COVID-19 positive; some were awaiting COVID-19 test results; some had not been tested for COVID-19; and some would later test negative for COVID-19."  (Report at pp. 115).

203.    Staff described moving the veterans as "total pandemonium" "when hell broke loose" and "a nightmare." One staff member, "felt it was like moving the concentration camp—we are moving the unknowing veterans off to die." (Report at p. 90).

204.    At one point during the move, Nurse Surreira pointed to the combined unit and stated: "All this room will be dead by tomorrow." (Report at p. 90).

205.    Housekeeping Supervisor Jermaine Potvin expressed concerns about combining units to Chief of Nursing Lauziere.  Chief Nurse Lauziere replied, "Just do your job, they are older, they are going to die anyway."

206.    While standing outside of a room where veterans would be transported, Chief Nurse Lauziere was heard saying, "something to the effect that this room will be dead by Sunday so we will have more room here." (Report at p. 90).

207.    Certified Nursing Assistant Shericann Graham recalled that the management said they were going to convert 1 North and 2 North to one floor because there is not enough staff.

208.    Many staff members begged Nurse Lauziere to change her mind and not combine the two units.

209.    They told her that she was directing them to combine symptomatic veterans with non-symptomatic veterans in close quarters in direct violation of what the federal and state guidance recommended.

210.    Lauziere rejected these pleas and ordered employees to continue combining the units.

211.    According to the Report: "With assistance from Ms. Surreira, Ms. Lauziere 'direct[ed] traffic' during the move." (Report at p. 88).

212.    According to the Report, "[Nurse] Surreira told housekeeping staff that if they were not going to be on the floor for more than 15 minutes, they did not need an N95 mask and could use a surgical mask instead." (Report at pp. 88-89).

213.    The Soldiers' Home Defendants ordered individuals who did administrative work to assist with the consolidation, exposing individuals without PPE and no health care experience to assist with caring for dying COVID patients.

214.     The Report describes the abhorrent conditions in which the Soldiers' Home
         Defendants forced the veterans to live and the employees to work:

         The veterans' beds and nightstands were directly next to each other and
         there were no privacy curtains between them.  None of the veterans'
         clothing or personal items were initially moved down to Unit 1-North with
         them.  There were insufficient outlets to plug in the beds, so some veterans
         could not elevate their beds.  At times, the names above the beds did not
         match the veteran who was in the bed. The dining room was made into a
         bedroom with nine beds in it. Veterans were sitting in common day rooms
         in their gowns. (Report at p. 90).

215.     Social Worker Orzechowski raised concerns with Nurse Lauziere about the risk of
         COVID-19 spreading. Nurse Lauziere replied "it didn't matter because [the
         veterans] were all exposed anyway and there was not enough staff to cover both
         units." (Report at p. 90).

216.     When an employee asked who had made this decision, Director of Nursing
         Lauziere responded, "We had no choice."

217.     Before the units were combined, Soldiers' Home Defendants did not ensure that
         the facility was equipped with sufficient pain-management medication.

218.     There were not enough electrical sockets for the patients, and the staff could not
         even adjust the veterans' beds to make them more comfortable.

219.     This caused employees to be forced to witness the excruciating pain and agony of
         the veterans as they died.

220.     The Defendants ordered employees to wear trash bags as PPE when providing
         meals to the veterans in the combined unit.

221.     The Soldiers' Home Defendants permitted the veterans to eat on regular plates,
         rather than paper plates, which exposed the kitchen staff to COVID.

222.     During this time, the Soldiers' Home Defendants ordered social workers to
         answer phone calls from the veterans' families, yet did not share with the social
         workers what the plans were for the facility or inform them about what they
         should be disclosing to the families.

223.     The reports from the unit are harrowing.

224.     For example, Licensed Practical Nurse (LPN 2) Khadene Stoby who worked an overnight shift on the combined unit recalls she was working with only one aide to treat more than 20 patients. At the time, there were over 15 patients who were running fevers.

225.     Ms. Stoby's overnight supervisor told her that the Soldiers' Home Defendants did not want to send sick veterans to the hospital for care; rather, the supervisor's proposed solution was, "Just keep giving them Tylenol and we'll test them [the veterans] in the morning."

226.     Upon information and belief, the Soldiers' Home Defendants instructed supervisors not to send any patients to the hospital, even though they knew that there were COVID-positive patients who were dying.

227.     Ultimately, the Report concluded:

> We find substantial evidence that the conditions and quality of care on the combined 1-North unit during the weekend of March 28-29 were deplorable. Clinical staff report that they tried to do the best they could under the circumstances, but they were unprepared, understaffed, and without sufficient resources and guidance. Some staff members reported that they were struggling to provide adequate care, including to keep veterans hydrated and to provide sufficient morphine and comfort medications to certain veterans who were dying.  Staff reported difficulties tracking which veterans had been fed.  One staff member said she observed a COVID-19 positive veteran who "had fecal matter on his socks and was laying on another vet's bed." Staff reported that they felt like it was "difficult" and "impossible" to keep the veterans in 1-North isolated from one another. Many of the veterans in the consolidated unit were "bed hoppers," meaning that in the fog of dementia, they would climb into various beds on the units. Some nursing aides expressed a concern that they could not keep track of which veterans were positive and which veterans was negative for COVID-19. (Report at p. 91).

228.     Several staff members described situations where "one veteran [was] taking his last breaths while the veteran next to him [was] eating his meals without the privacy of curtains" between them.

229.     Social Worker Carrie Forrant provided this narrative:

I was sitting with a veteran holding his hand, rubbing his chest a little bit. Across from him is a veteran moaning and actively dying. Next to me is another veteran who is alert and oriented, even though he is on a locked dementia unit. There is not a curtain to shield him from the man across from him actively dying and moaning, or a curtain to divide me and the veteran I am with at the time, from this alert, oriented veteran from making small talk with the confused little fellow. He is alert and oriented, pleasantly confused, and talking about the Swedish meatballs at lunch and comparing them with the ones his wife used to make. I am trying to not have him concentrate on the veteran across from him who is actively dying, or the one next to him who I am holding his hand while he is dying. It was surreal    . . . I don't know how the staff over in that unit, how many of us will ever recover from those images.  You want to talk about never wanting this to happen again. (Report at pp. 90- 91).

230.    Certified Nursing Assistant Sophia Darkowaa recalls that while working on the combined unit, six veterans died in her arms.

231.    She remembers that during this time in late March, she always smelled like death.

232.    When she went home, she would vomit continuously.

233.    On March 27, 2020, at the same time that Units 1-North and 2-North were being combined, Superintendent Walsh sent an email to Secretary Urena and others who worked for the Department of Veteran Services informing them that the death toll was now at two veterans. He did not disclose the decision to combine the two units.

234.    The death toll began to grow dramatically.

235.    Mr. Walsh was not present at the Soldiers' Home on the weekend of March 28-29, 2020.

236.    He did not visit the combined 1-North and 2-North housing units during the period March 27-30, 2020.

237.    Superintendent Walsh avoided speaking with union representatives about the health and safety of the employees.

238.    Employees thus felt they had no alternative but to seek help from outside the Soldiers' Home.

239.    On the morning of March 28, 2020, Holyoke Mayor Alex Morse received an anonymous email from a Soldiers' Home employee describing the deplorable conditions and reporting eight deaths.

240.    At the same time, a reporter for a local news station contacted the Department of Veterans' Services disclosing that she had been contacted by an employee concerning the deplorable conditions in the Home and asking for comment.

241.    Secretary Urena became aware of both reports.

242.    Secretary Urena confronted Walsh by email about the allegation that there had been eight deaths, rather than two, and ordered that they talk on the phone the next day.

243.    In response, Walsh claimed "what should be discussed is the amount of call outs by [SEIU Local] 888 the past week.  The reference that the management is creating this issue and has a part in deaths is very concerning." (Report at page 103).

244.    The next day, Secretary Urena asked Walsh if employees were being floated between infected and non-infected units.

245.    Superintendent Walsh falsely stated that "they only work in the one unit" and, "We've done that for two weeks, attempt[ed] to keep same staff on same unit." (Report at p. 103).

246.    This was not true.

247.    Later that afternoon, the Department of Veterans' Affairs held a phone call with Soldiers' Home leadership, including Superintendent Walsh, Nurse Lauziere, and Dr. Clinton. None of these Defendants disclosed that there had been eight COVID-related deaths.

248.    Later that evening, Holyoke Mayor Alex Morse and his chief of staff telephoned Walsh to discuss the growing concerns they had about the Soldiers' Home, with an offer to make city resources available to assist the Soldiers' Home.

249.    Mr. Walsh declined Mayor Morse's offer of assistance, but confirmed that there had been eight deaths between Wednesday and Sunday of that week. (Report at p. 104).

250.    Walsh then called Secretary Urena to complain about Mayor Morse.

251.    Defendant Walsh misrepresented the state of the Soldiers' Home to Secretary Urena and continued to present a picture that the Soldiers' Home Defendants were handling the situation appropriately. He deliberately withheld the death count from Secretary Urena during the conversation.

252.    Later that evening, Secretary Urena and Superintendent Walsh spoke again, Walsh again tried to discourage Urena from speaking directly with Mayor Morse. (Report at page 105).

253.    By 8:00 that evening, Secretary Urena, Mr. Walsh, Mayor Morse, and others participated in a conference call. Mayor Morse opened the call by explaining Walsh had told him earlier that day that there had been eight deaths at the facility. Mr. Walsh confirmed this death toll. (Report page 105).

254.    Around 9:00 p.m. Secretary Urena texted Superintendent Walsh asking him "have you had 8 deaths? Is that accurate? On the phone with [Health and Human Services ("HHS")] . . . can we get on a conference call; HHS is looking for more information." Mr. Walsh replied, "Is this because of the mayor of Holyoke. [sic] I hope not." (Report p. 106).

255.    Superintendent Walsh continued to deflect and avoid taking responsibility for his catastrophic decisions, thereby delaying necessary aid to the home.

256.    At approximately 9:30 p.m., Superintendent Walsh and Nurse Lauziere participated in a conference call with Secretary of Health and Human Services Marylou Sudders and Secretary Urena, among others.

257.    Secretary Sudders asked Walsh to explain how the death toll had increased so dramatically and what the accurate numbers were.

258.    "Mr. Walsh hesitated.  At one point during the call, Mr. Walsh and Secretary Urena contradicted each other about the number of deaths, with Secretary Urena saying that Mr. Walsh had said that there were four—not eight—deaths." (Report at 106).

259.    Secretary Sudders asked Nurse Lauziere to report the accurate number of deaths.

260.     According to the Report, "Ms. Lauziere was shuffling papers in the background and put the phone on hold 'for a few minutes,' where Acting Secretary Tsai perceived that she was calling other people.  Ms. Lauziere then reported that the death toll was eight veterans." (Report at 106).

261.     On March 30, 2020, at approximately 7:00 a.m., Superintendent Walsh updated Secretary Urena of the situation in a telephone call, stating: "Mr. Secretary, I apologize for not telling you about all these deaths." (Report at p. 107).

262.     On March 30, 2020, Superintendent Walsh was removed as Superintendent, and a response team arrived at the facility.

263.     When the response team arrived, they noticed that staff was tending to patients, some with gowns but no masks; some with only masks; and some with only gloves on. It appeared that there had been absolutely no guidance or leadership or education or training about how to care for infected patients. (Report at p. 111).

264.     As a result of the Soldiers' Home Defendants' deliberate indifference to the health and safety of the staff, scores of employees tested positive for COVID.

265.     Some of those employees had underlying disabilities that the Soldiers' Home defendants were on notice of, which exacerbated their COVID-19 symptoms.

266.     Many employees were admitted to the hospital.

267.     Employees were told to say goodbye to their families because they might die.

268.     One employee who was severely sick, actually planned her funeral.

269.     Many still experience residual, or so-called "long-haul" symptoms, such as dizziness, headaches, confusion, trouble breathing, itchy eyes, sleeplessness.

270.     One tradition at the Soldiers' Home is that when a veteran dies, the Home conducts a "dignified transfer ceremony" where staff and other veterans salute the deceased veteran and Taps is played to honor the veteran's service to our nation.

271.     During March, this practice was suspended.

272.     When it resumed in April, because of the number of deaths, taps was played constantly, which caused extreme emotional distress to the staff.

273.    Staff watched in horror as the veterans asked God to let them die.

274.    No legal proceeding will restore the health of the employees who were severely impacted by contracting COVID-10.

275.    Likewise, no legal proceeding will heal the trauma that these employees suffered, watching people who served our country lose their lives in such inhumane and undignified circumstances.

276.    The employees bring this suit to demand accountability for the gross violation of rights caused by the decisions of the Soldiers' Home Defendants, which caused such catastrophic death and destruction.

COUNT I
FOURTEENTH AMENDMENT
TO THE UNITED STATES CONSTITUTION
42  U.S.C. § 1983

277.    The foregoing paragraphs are incorporated as if stated here.

278.    The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property without due process of law."

279.    The Soldiers' Home Defendants' acts and omissions were made under the color of state law.

280.    The Soldiers' Home Defendants violated the rights of Kwesi Ablordeppey, and other similarly situated employees who worked at the Soldiers' Home, by failing to protect them from harm, provide them with a safe working environment, and/or provide them with minimally adequate medical and nursing equipment.

281.    The Soldiers' Home Defendants' actions were a substantial departure from accepted professional standards for the provision of medical and nursing care in a nursing facility.

282.    The Soldiers' Home Defendants' acts and omissions were done with deliberate indifference, and constituted deliberate disregard for the health, safety, and federal rights of the employees of the Soldiers' Home.

283.    The Soldiers' Home Defendants acts and omissions shock the conscience.

284.    Pursuant to 42 U.S.C. § 1983, the Plaintiffs seek recovery to the greatest extent available under the law for Kwesi Ablordeppey and all others similarly situated who either were infected by COVID-19 at the Soldiers' Home or experienced extreme emotional distress as a result of what occurred there.

WHEREFORE, the Plaintiff requests that the Court:

1.      Certify a class of individuals who suffered as a result of contracting COVID-19 while working at the Soldiers' Home between February 1, 2020 through April 1, 2020;

2.      Order adequate notice pursuant to Fed Rule. Civ. P. 23(c) and (d) to all member of the class;

3.      Appoint undersigned counsel as counsel for the class pursuant to Fed. R. Civ. P. 23(g);

4.      Award the Plaintiff and class members damages to the fullest extent available under the law;

5.      Grant any other relief to which the Plaintiff and class members might be entitled.

## <u>JURY DEMAND</u>

The Plaintiff requests a trial by jury on all Counts so triable.

Respectfully submitted,
Plaintiff,
KWESI ABLORDEPPEY
*and others similarly situated*,
By his attorneys,

*/s/ Leonard H. Kesten*
Leonard H. Kesten, BBO# 542042
Erica L. Brody, BBO# 681572
Allison L. O'Connell BBO # 690219
Brody, Hardoon, Perkins & Kesten, LLP
699 Boylston Street, 12th Floor
Boston, MA 02116
(617) 880-7100
lkesten@bhpklaw.com
ebrody@bhpklaw.com
aoconnell@bhpklaw.com

Dated: August 13, 2021